1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| JESSE SANCHEZ HERNANDEZ, | ) ) ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) ) ) |
| | ) |

1:10-cv-01800-LJO-SKO

**FINDINGS AND RECOMMENDATIONS
REGARDING PLAINTIFF'S SOCIAL
SECURITY COMPLAINT**

(Docket No. 1)

18

19

## **BACKGROUND**

20      Plaintiff Jesse Sanchez Hernandez ("Plaintiff") seeks judicial review of a final decision of

21 the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application

22 for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act").

23 42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were

24 submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

25 Judge.

26                              **FACTUAL BACKGROUND**

27      Plaintiff was born in 1948, completed the 12th grade, and worked from 1983 through 2006

28 as a maintenance worker, handling plumbing emergencies, gas leaks, electrical repair, cooler

maintenance, lawn maintenance, drywall repair, sprinkler repair, and floor tile repair. (Administrative Record ("AR") 139, 151, 156.)  On March 8, 2007, Plaintiff filed an application for DIB, alleging disability beginning on December 26, 2006, due to asthma, disc problems, enlarged heart, diabetes, sleep apnea, and arthritis.  (AR 61, 70, 139, 150.)

**A.    Medical Evidence**

Plaintiff was seen from March 2001 through July 2004 at Baz Allergy and Asthma Institute for treatment for allergies and asthma.  (AR 304-37.)

Plaintiff had radiology procedures performed at Sierra-Kings District Hospital ("Sierra-Kings") between April 26, 2002, through May 7, 2003, including ultrasound of his right knee, a cervical spine x-ray, a lumbar spine x-ray, and two chest x-rays.  (AR 361-68.)  The knee ultrasound and the chest x-rays were normal, and the cervical spine and lumbar spine x-rays indicated degenerative disk disease and mild limitation of motion.  (AR 361-38.)

On October 11, 2005, an x-ray of Plaintiff's left shoulder was taken at Sierra-Kings, which revealed "[m]ild degenerative changes of the left shoulder joint" and "[e]vidence of calcific tendinitis."  (AR 359.)

On November 15, 2005, Plaintiff was seen by Michael W. Gen, M.D., for fatigue, although he had originally been referred to Dr. Gen for metabolic syndrome, diabetes mellitus, and abnormal electrocardiography ("ECG").  (AR 228.)  Dr. Gen indicated that Plaintiff's assessment, diagnosis, and past medical history included atrial fibrillation, hypertension, Type II diabetes mellitus, obesity, and metabolic syndrome and that the current medical regime included the medications Diovan, Advair, Singulair, Allegra, Albuterol, aspirin, Flonase, Lotrel, and Crestor.  (AR 228.)  Dr. Gen noted that Plaintiff "was able to exercise up to 93% of predicted maximum heart rate with no evidence of ischemia by ECG" and that "[h]is blood pressure appears perfectly controlled."  (AR 228; *see also* AR 230-31.)

On June 17, 2006, Plaintiff was seen at UCSF Fresno Division of Pulmonary Critical Care & Sleep Disorders Center ("UCSF Fresno") for evaluation for snoring and sleep apnea.  (AR 197-98.)  An overnight polysomnography was performed and showed that Plaintiff had "severe

obstructive sleep apnea." (AR 196.)  Plaintiff "elected to try [a] nasal CPAP" (continuous positive airway pressure) to treat his condition, as opposed to surgical intervention at that time.  (AR 196.)

On October 6, 2006, a lumbosacral spinal x-ray was taken at Sierra-Kings.  (AR 358.)  The report indicated an impression of "multilevel degenerative changes" and "mild narrowing of the neural foramen bilaterally at multiple levels," but "no acute fracture of dislocation."  (AR 358.)

On November 16, 2006, Plaintiff underwent a magnetic resonance imaging ("MRI") scan of his lumbar spine at Sierra-Kings.  (AR 356-57.)  The report indicated that there was "moderately severe  degenerative changes of the lumbosacral spine," including "multilevel degenerative disk disease and facet arthropathy." (AR 357.)  At the L4-L5 level, there was "mild to moderate posterior and posterolateral disk bulging," "slight ventral extradural contouring of the thecal sac," and "some facet arthropathy and ligamentous hypertrophy.  This combination of changes [was] causing minimal spinal stenosis and some encroachment upon the lateral recesses most prominent on the left.  There appear[ed] to be moderate to severe narrowing of the neural foramina at this level." (AR 356.)  At the L5-S1 level there was "mild to moderate posterior and posterolateral disk bulging," and "some increase signal within the posterior aspect of the disk suggesting a tear of the annulus." (AR 357.)  The findings indicated that "[t]here does not appear to be any significant overall spinal stenosis at this level" but there appeared to be "moderate to severe narrowing of the neural foramina" and "mild to moderate degenerative changes of the sacroiliac joint."  (AR 357.)

On December 5, 2006, Dr. Gen indicated that the medications Singulair and Crestor had been discontinued and that an echocardiogram performed on Plaintiff "showed significant hypertrophy which was quite concerning, particularly in light of sleep apnea for which he is now using CPAP." (AR 229, *see also* AR 264.)  Dr. Gen noted that Rokshana Zeheen, M.D., had reported an atrial fibrillation in his "office some time ago" which Dr. Gen had "never documented." (AR 229.)  Dr. Gen indicated that Plaintiff should not be placed on a Coumadin anticoagulation "without clear recurrence of atrial fibrillation or further documentation," but instead placed Plaintiff on a "surveillance 24-hour Holter monitor" that, "if normal," would "preclude" Plaintiff from using Coumadin.  (AR 229.)

1    On December 27, 2006, a computed tomography ("CT") scan of Plaintiff's abdomen and

2  pelvis was performed at Sierra-Kings.  (AR 354-55.)

3    On January 2, 2007, Plaintiff was seen by Irwin Barg, M.D., of Urology Associates of Central

4  California Medical Group, and returned for a cystoscopy on January 9, 2007.  (AR 251-57; *see also*

5  AR 261.)  Dr. Barg noted that Plaintiff's prostrate was "normal" upon examination but that he had

6  "trilobar enlargement and partial bladder outlet obstruction."  (AR 257.)

7    On April 9, 2007, an x-ray of Plaintiff's lumbosacral spine was taken at Sierra-Kings, which

8  indicated that there were "multilevel degenerative changes" but "no acute fracture or dislocation"

9  and "no abnormal subluxation on the flexion and extension views."  (AR 353.)

10    On May 29, 2007, Plaintiff was referred to Samuel B. Rush, M.D., for a disability

11  examination.  (AR 258-60.)  Dr. Rush indicated that Plaintiff "seemed to be a good historian" who

12  stated that "he had back pain for about three or four years, worse with prolonged sitting, in his lower

13  back."  (AR 258.)  Plaintiff also reported "some numbness of his lower extremities" and that "[h]e

14  was told he had a disc out of place."  (AR 258.)  Plaintiff stated that he had diabetes mellitus that

15  was "under very good control," high blood pressure, a history of asthma, and "recent" bronchitis.

16  (AR 258.) Dr. Rush noted that Plaintiff "retired for health reasons," which "apparently were asthma

17  and low back discomfort."  (AR 259.)  Dr. Rush conducted a physical examination, during which

18  the orthopedic testing indicated the following:

19    Normal range of motion of the cervical spine, both shoulders, elbows, forearms,
      wrists, and hands.  Excellent grip on both hands.  Lumbar spine can be extended to
20    30 degrees and slowly flexed to 90 degrees.  Both hips, knees, ankles and feet are
      normal. [Plaintiff] gets on and off the examination table by himself unassisted and
21    seems to walk fairly normally.

22  (AR 259.) Dr. Rush opined that Plaintiff had "subjective low back discomfort with normal range

23  of motion" and that "[p]erhaps some physical therapy of his back would be helpful."  (AR 259-60.)

24    On May 31, 2007, a chest x-ray was taken at Sierra-Kings, which was "normal."  (AR 350.)

25

26

27

28

On June 14, 2007, Brian J. Ginsburg, M.D., performed a physical residual functional capacity ("RFC") assessment.[1]  (AR 272-79.)  Dr. Ginsburg opined that Plaintiff was limited to occasionally lifting 50 pounds and frequently lifting 25 pounds, could sit, stand and/or walk for about six hours in an eight-hour day, and had unlimited push/pull abilities.  (AR 273.)  Plaintiff was limited to occasionally kneeling and crawling but had no limitations as to climbing, balancing, stooping, or crouching, and no manipulative, visual, or communicative limitations.  (AR 275-76.)  Plaintiff's only environmental limitation was to "avoid concentrated exposure" to "fumes, odors, dusts, gases, poor ventilation, etc."  (AR 276.)  Dr. Ginsburg examined the "significant objective findings" in the record and determined that Plaintiff's "PSA levels are [within normal limits], cardio testing was normal, [Plaintiff] has normal [range of motion] of all joints, [diabetes mellitus] has caused some Diabetic neuropathy.  Asthma has not caused any significant problems." (AR 278-79.) Dr. Ginsburg opined that Plaintiff would be capable of a "[m]edium RFC [with] postural limitations [and] environmental precautions."  (AR 279.)  The RFC finding was affirmed by Natalie G. Marroquin, M.D., on August 27, 2007.  (AR 302-03.)

On August 14, 2007, Perminder Bhatia, M.D., provided an electromyography ("EMG") report indicating that Plaintiff had "electrical evidence of clinical diagnosis of possible axonal neuropathy" and "advised" a "clinical correlation."  (AR 299.)  However, Dr. Bhatia "did not find any evidence of radiculopathy."  (AR 299.)

A chest x-ray was taken at Sierra-Kings on January 26, 2008, which was "normal." (AR 352.)

**B.     Administrative Hearings**

The Commissioner denied Plaintiff's applications initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

---

[1] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

(AR 78-81, 83-87, 88.)  ALJ Michael J. Haubner held a hearing on May 27, 2009, at which Plaintiff and vocational expert ("VE") Cheryl Chandler testified.  (AR 19-60.)

### 1.   Plaintiff's Testimony

Plaintiff testified that he was born in 1948, completed the 12th grade, previously worked performing housing and grounds repair and maintenance, and became disabled as of December 26, 2006. (AR 26-27.)  Plaintiff was married and lived with his wife.  (AR 29.)  Plaintiff stated that he had a driver's license and was able to drive daily.  (AR 28-29.)   Plaintiff had a pet dog that he walked two to three times a week, "around the bock or so." (AR 29-30.)  Plaintiff indicated that he could care for his personal needs.  (AR 30.)  Although his wife prepared most of the meals, Plaintiff stated that he would cook twice a month and would also do simple meal preparation two to three times a week.  (AR 30-31.)  Plaintiff testified that he would perform household chores, including doing dishes twice a week, emptying the trash three times a week, performing yard work such as watering three times a week and mowing the lawn every two weeks, making the bed twice a week, and changing the sheets twice a month with assistance from his wife.  (AR 31-33.)  Plaintiff would also shop for groceries three times a month and would occasionally do other shopping.  (AR 34.)  Plaintiff attended church twice a week, would sit, kneel, and stand during the church service, and attended a Bible study group once a week for an hour at a time.  (AR 34-36.)  Plaintiff would visit with other people outside of his home, including neighbors, twice a week.  (AR 37.)

Plaintiff indicated that he did not quit working because he was told to by a doctor, but stated that he "quit on [his] own" because he "thought [he] couldn't do it [the work] anymore." (AR 27.)  He said that left his former position on "regular retirement." (AR 27.)  Plaintiff asserted that he retired from his job because he felt "always fatigued," and was "having more asthma symptoms at work because of the triggers at work." (AR 41.)  He indicated that he had been "taken by ambulance two times from work" because of an "asthma reaction," and he had "episodes" where he "just sat them out" and took medication at work.  (AR 41.)  As a result, he was unable to perform his "normal production at work." (AR 42.)

Plaintiff testified that he was on medication for diabetes and that he would test his blood sugar twice a week as opposed to daily, as he had been instructed, due to financial reasons because

the testing strips were "too expensive to do it every day." (AR 37, 41.) He followed his treatment recommendations and took his medications "[a]bout 80 percent" of the time, because he did not have insurance; he also had to take "lesser quality medications" due to his lack of insurance. (AR 42.) Plaintiff had been told by his doctor to lose weight and stated that he was following his weight loss and diabetes diet "70 percent" of the time. (AR 38-39.) Plaintiff said that he was able to lift ten to fifteen pounds, could stand and/or sit for two hours, and could walk a city block. (AR 39.) Plaintiff needed to lie down and elevate his feet four times a day due to pain or fatigue. (AR 39-40.) Plaintiff stated that he could only concentrate for a "half an hour" on one thing and then would need to rest his mind for ten minutes before he could concentrate again. (AR 40.) Plaintiff indicated that he had arthritis in his hands, numbness in his legs, pain in his lower back that spread down his legs, and that he was allergic to "just about anything." (AR 45-46.)

**2.     VE Testimony**

The VE testified that Plaintiff's former position as a building maintenance repairer was a medium, skilled job, but that Plaintiff performed it at the heavy level. (AR 50.)  There was no transferability of skills to lighter level positions because his prior work was "medium across all levels." (AR 50.)  The ALJ asked the VE whether a hypothetical person could perform Plaintiff's past relevant work if that person was someone with Plaintiff's age, education, language, and work background who was restricted to lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing, walking, and sitting six hours out of eight, had unlimited push/pull ability, and could do occasional stooping and crouching, frequent climbing, balancing, kneeling and crawling, but was limited to avoiding concentrated exposure to fumes, odors, dust, gases, and poor ventilation. (AR 51.) The VE testified that a hypothetical person could not perform Plaintiff's past relevant work because stooping and crouching needed to be more than occasional, but that such a person could perform other work, including working in a construction-related capacity and working as an equipment operator, a construction laborer, and an electrician, all of which were light and semi-skilled.  (AR 52-53.)  The VE further testified that such a person could perform medium, unskilled jobs including production works, drivers, and hand packagers, with a reduction in the number of jobs available due to the restriction of occasional bending. (AR 54.)

1    The ALJ posed a second hypothetical to the VE based on Plaintiff's testimony that he can

2    lift and carry 10 to 15 pounds, can sit for two hours, can walk one block at a time, needs to lie down

3    or elevate his feet for four hours out of eight, and can only concentrate for 30 minutes before needing

4    to mentally rest for 10 minutes. (AR 54-55.) The VE testified that such a hypothetical person could

5    not perform Plaintiff's past relevant work or other work. (AR 55.)

6        Plaintiff's counsel questioned the VE if there would be any changes to the jobs that could be

7    performed in the first hypothetical if the limitation was changed from avoiding concentrated

8    exposure to fumes to avoiding moderate exposure and having "asthma restrictions." (AR 56.) The

9    VE responded that the restriction would be "nebulous." (AR 58.) With regards to production work,

10   the VE testified that there were "three and a half pages" worth of listings in the DOT of "30 [jobs]

11   to a page" and that some environments would be "clean" environments with less exposure to dust

12   and particulates, such as computer and food environments. (AR 58-59.)

13   **D.    ALJ's Decision**

14       On September 1, 2009, the ALJ issued a decision finding Plaintiff not disabled since

15   December 26, 2006, the date of Plaintiff's alleged disability onset. (AR 6-16.) Specifically, the ALJ

16   found that (1) Plaintiff met the insured status requirements of the Act through December 31, 2011;

17   (2) Plaintiff had not engaged in substantial gainful activity since December 26, 2006, the alleged

18   disability onset date; (3) Plaintiff had "severe" impairments of diabetes mellitus II, peripheral

19   neuropathy, asthma, history of sleep apnea on CPAP, lumbar degenerative disc disease, and obesity

20   based on the requirements in the Code of Federal Regulations; (4) Plaintiff did not have an

21   impairment or combination of impairments that met or equaled one of the impairments set forth in

22   20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Plaintiff had the RFC to lift and carry 50 pounds

23   occasionally and 25 pounds frequently, to sit, stand, and walk for six hours in an eight-hour day, to

24   occasionally stoop and crouch and frequently climb, balance, kneel and crawl, and should avoid

25   concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; (6) Plaintiff was unable

26   to perform past relevant work; (7) Plaintiff was defined as an individual approaching retirement age

27   on the alleged disability onset date; (8) Plaintiff had at least a high school education and was able

28   to communicate in English; (9) the transferability of job skills was not material to the disability

determination because Plaintiff was "not disabled" under the Medical-Vocational Rules whether or not Plaintiff had transferrable job skills; (10) there were jobs that exist in significant numbers in the national economy which Plaintiff could perform; and (11) Plaintiff had not been under a disability as defined in the Social Security Act since December 26, 2006, through the date of the decision. (AR 11-16.)

Plaintiff sought review of this decision before the Appeals Council.  (Doc. 4.)  On July 29, 2010, the Appeals Council denied review.  (AR 1-3.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

**E.    Plaintiff's Contentions on Appeal**

On September 29, 2010, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  Plaintiff contends that the ALJ (1) incorrectly rejected Plaintiff's testimonial evidence; (2) improperly relied upon the consultative medical opinion of Dr. Rush; and (3) failed to meet Defendant's burden at Step Five.  (Doc. 14.)

**SCOPE OF REVIEW**

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Comm\issioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may

1   not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*,

2   504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

3                                          **APPLICABLE LAW**

4           An individual is considered disabled for purposes of disability benefits if he or she is unable

5   to engage in any substantial, gainful activity by reason of any medically determinable physical or

6   mental impairment that can be expected to result in death or that has lasted, or can be expected to

7   last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

8   1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

9   impairments must result from anatomical, physiological, or psychological abnormalities that are

10  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

11  such severity that the claimant is not only unable to do his previous work, but cannot, considering

12  his age, education, and work experience, engage in any other kind of substantial, gainful work that

13  exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

14          The regulations provide that the ALJ must undertake a specific five-step sequential analysis

15  in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the

16  claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).

17  If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment

18  or a combination of impairments significantly limiting him from performing basic work activities.

19  *Id.* §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the

20  claimant has a severe impairment or combination of impairments that meets or equals the

21  requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.   *Id.*

22  §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant

23  has sufficient RFC despite the impairment or various limitations to perform his past work.   *Id.*

24  §§ 404.1520(f), 416.920(f).   If not, in the Fifth Step, the burden shifts to the Commissioner to show

25  that the claimant can perform other work that exists in significant numbers in the national economy.

26  *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in

27  the sequence, there is no need to consider subsequent steps.   *Tackett v. Apfel*, 180 F.3d 1094,

28  1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

1

**DISCUSSION**

2

**A.     The ALJ's Consideration of Dr. Rush's Medical Opinion**

3        Plaintiff contends that the ALJ improperly relied upon the medical opinion of Dr. Rush.

4   (Doc. 14, pp. 2, 5-6.)  Defendant contends that the ALJ properly weighed and considered Dr. Rush's

5   opinion.  (Doc. 15, 6:18-7:21.)

6        **1.     Legal Standard**

7        The medical opinions of three types of medical sources are recognized in Social Security

8   cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat

9   the claimant (examining physicians); and (3) those who neither examine nor treat the claimant

10  (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

11       Generally, a treating physician's opinion should be accorded more weight than opinions of

12  doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater

13  weight than a non-examining physician's opinion.  *Id.*  Where a treating or examining physician's

14  opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing"

15  reasons for rejecting the treating physician's ultimate conclusions.  *Id.*  If the treating or examining

16  doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific

17  and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by

18  substantial evidence in the record.  *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*,

19  574 F.3d 685, 692 (9th Cir. 2009).  The ALJ can meet this burden by setting forth a detailed and

20  thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof,

21  and making findings.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

22       **2.     The ALJ Properly Considered Dr. Rush's Findings**

23       Plaintiff argues that the ALJ "improperly relied on a consultative medical opinion" of Dr.

24  Rush, contending that Dr. Rush "did not identify any specific limitations on Plaintiff's ability to sit,

25  stand, or walk" and "evidently did not review Plaintiff's x-rays, MRI and/or EMG results or medical

26  records, which confirmed [Plaintiff's] degenerative disc disease and neuropathy."  (Doc. 14, pp. 2,

27  5.)  Plaintiff further asserts that "[a] bigger problem with Dr. Rush's opinion is that it did not identify

28  any functional limitations."  (Doc. 14, p. 5.)  Plaintiff contends that "[n]evertheless, the ALJ

accepted [Dr. Rush's] objective findings and diagnoses, and found that they could reasonably be expected to produce some of Plaintiff's alleged symptoms.  However [the ALJ] erroneously concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible."  (Doc. 14, pp. 5-6.)

Defendant contends that Plaintiff "does not articulate what the ALJ's error was [when considering Dr. Rush's opinion] or what evidence allegedly merited greater weight.  Plaintiff does not bother to explain the issue raised" and instead "simply stat[es] that the ALJ was wrong."  (Doc. 15, 6:18-23.)

The ALJ considered Dr. Rush's opinion and made the following determination:

In May 2007, Dr. Samuel Rush consultatively examined the claimant.  The claimant had low back discomfort with normal range of motion and excellent grip in both hands.  He could use both hands in fine manipulation, simple grasping, pushing, and pulling.  Objectively, he walked normally.  Dr. Rush diagnosed claimant to be overweight (moderately), low back syndrome, suspected mechanical strain, possible disc problem, numbness of the legs, history of benign prostatic hypertrophy, and diabetes mellitus type II . . . . Chest x-rays were normal.

(AR 12.)  The ALJ further discussed Dr. Rush's findings by noting:

The claimant also alleges osteoarthritis in both hands, but also admitted he had not seen anyone for this problem or even complained of this to any of his health care providers.  Furthermore, Dr. Rush noted that the claimant had excellent grip in both hands, and could use both hands in fine manipulation, simple grasping, pushing, and pulling.  The claimant had subjective low back discomfort but had normal range of motion, and walked normally.

(AR 14.)

Plaintiff was seen by Dr. Rush on May 29, 2007.  (AR 258-60.)  Dr. Rush conducted a physical examination of Plaintiff, including orthopedic testing that indicated "[n]ormal range of motion of the cervical spine, both shoulders, wrists and hands" and that the "[l]umbar spine can be extended to 30 degrees and slowly flexed to 90 degrees."  (AR 259.)  Dr. Rush further indicated that "[r]ecords were reviewed and include a negative cardiac work-up in the past" and, although it is not explicitly stated what records were reviewed, it is noted that Plaintiff's MRI was performed on November 16, 2006, approximately six months prior to his visit with Dr. Rush.  (AR 259, 356-57.)  Based upon his own objective testing and review of Plaintiff's records, Dr. Rush opined as follows:

1
2
3
4

> In summary, [Plaintiff] has subjective low back discomfort with normal range of motion. He has good use of his hands, excellent grip in both hands. He could use both hands in fine manipulation, simple grasping, pushing, and pulling. Objectively, he seems to walk normally. Perhaps some physical therapy of his back would be helpful. He is scheduled for a nerve conduction study of his lower legs. His prostate symptoms are stable.

5   (AR 259-60.)

6   The ALJ relied, in part, upon Dr. Rush's opinion when determining Plaintiff's impairments

7   and RFC, as well as when finding Plaintiff was not entirely credible regarding his allegations of

8   osteoarthritis in his hands. Plaintiff's allegations were contrary to Dr. Rush's test results that showed

9   Plaintiff had excellent grip in both hands and could use both hands for fine manipulation, simple

10  grasping, pushing, and pulling. (AR 12, 14.)

11  Plaintiff fails to articulate how the ALJ "improperly relied on a consultative medical opinion"

12  as he contends. (Doc. 14, p. 2.) Plaintiff does not assert how Dr. Rush's opinion was improperly

13  weighed by the ALJ. Plaintiff does not establish that any other medical opinion in the record

14  indicated greater or more restrictive limitations than those set forth by Dr. Rush, nor that Dr. Rush's

15  opinion was contradicted by any other medical findings. (*See* Doc. 14; *see also* Doc. 16 (Plaintiff's

16  Reply Brief), which fails to articulate any argument concerning Dr. Rush.)

17  The ALJ may rely upon the findings of an examining physician in making his decision.

18  "Reports of consultative physicians called in by the [Commissioner] may serve as substantial

19  evidence." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (citations omitted); *see also*

20  *Tonapetyan v. Halter*, 242 F.3d at 1149 (An examining physician's "opinion alone constitutes

21  substantial evidence, because it rests on his own independent examination."). Here, Dr. Rush

22  conducted his own independent examination of Plaintiff and made findings upon which the ALJ is

23  entitled to consider and rely.

24  Additionally, the ALJ relied not only upon Dr. Rush's opinion, but also upon the opinions

25  of the State Agency physicians who reviewed Plaintiff's records and determined that he could "lift

26  and carry 50 pounds occasionally and 25 pounds frequently, sit, stand, and walk for six hours in an

27  8-hour day, occasionally stoop and crouch and frequently climb, balance, kneel, and crawl, and

28  should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation." (AR 14;

*see also* AR 272-79 (Dr. Ginsburg's RFC assessment) and AR 302-03 (Dr. Marroquin's case analysis).)  The Commission considers "all evidence from nonexamining sources to be opinion evidence."  20 C.F.R. § 404.1527(f).  "Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review." SSR-96-6p.[2]  As such, the ALJ may rely upon the opinions of nonexamining physicians when determining Plaintiff's RFC.

It is the ALJ's responsibility to provide an interpretation of the facts and conflicting clinical evidence, and make a finding based on that interpretation.  *See Tommasetti*, 533 F.3d at 1041.  Here, however, Plaintiff fails to articulate what medical-opinion evidence conflicted with Dr. Rush's findings that the ALJ failed to consider and interpret, nor does there appear to be any evidence in the record that actually conflicts with Dr. Rush's opinion.  As such, the ALJ properly relied upon Dr. Rush's medical opinion in making his determination as to Plaintiff's RFC.

**B.    The ALJ's Determination of Plaintiff's Credibility**

Plaintiff contends that the ALJ failed to set forth legally sufficient reasons for rejecting his subjective complaints.  According to the Commissioner, however, the ALJ gave valid reasons for finding Plaintiff not entirely credible.  In considering Plaintiff's credibility, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce only some of the alleged symptoms, but that claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible."  (AR 14.)

**1.    Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying

---

[2] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted.  20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding precedent upon ALJs.  *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999).

impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

### 2. The ALJ Provided Clear and Convincing Reasons for Rejecting Plaintiff's Subjective Complaints

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (AR 22.) Therefore, absent affirmative evidence of malingering, the ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing. *Vasquez*, 572 F.3d at 591.

The ALJ provided numerous reasons why he found Plaintiff "not entirely credible." (AR 14.) Specifically, the ALJ stated that:

> The claimant has not received treatment consistent with a chronic pain syndrome such as biofeedback, acupuncture, use of a TENS unit, physical therapy, or attendance at a pain management clinic. Surgery has never been recommended. In October 2007, Dr. Bhatia referred the claimant to physical therapy, but there is no indication in the record that the claimant actually had physical therapy . . . . The claimant alleges leg numbness, but his EMG was essentially normal. . .

(AR 14.)

The ALJ also stated that, although Plaintiff's had a "good work history, he testified he took regular retirement on his own and that no doctor told him to stop working." (AR 14.) The ALJ noted that Plaintiff was "only 70 percent compliant" with his diabetes mellitus and weight loss diet, was "not fully compliant with his medications," engaged in a "wide range of activities of daily living," and "exaggerate[d] somewhat" his symptoms, including asserting that he was able to concentrate for no more than 30 minutes without requiring a 10 minute mental rest while being able to concentrate throughout the entire hearing of almost one hour. (AR 14.)

The ALJ found that Plaintiff's symptoms were inconsistent with the medical record as Plaintiff alleged "osteoarthritis in both hands" but "admitted" that he had not sought medical attention for this condition; further, the ALJ noted that Dr. Rush's testing indicated that Plaintiff "had excellent grip in both hands, and could use both hands in fine manipulation, simple grasping, pushing, and pulling." (AR 14.)

Plaintiff contends that the ALJ failed to provide clear and convincing reasons to reject Plaintiff's credibility and takes issue with the reasons provided, essentially asserting that ALJ's interpretation was incorrect. (Doc. 14, pp. 6-11.) The crux of Plaintiff's assertions is that the ALJ improperly interpreted the evidence in the record against Plaintiff. However, the evidence in the record is subject to more than one reasonable interpretation. Thus, even if "the ALJ's interpretation . . . may not be the only reasonable one," so long as it is "still a reasonable interpretation and is supported by substantial evidence" it is not the Court's "role to second-guess it." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citation omitted). Accordingly, if the ALJ provides a reasonable interpretation of the evidence that is supported by the record, the Court must affirm the decision. As set forth below, the ALJ reasonably interpreted the evidence in concluding Plaintiff lacked credibility with respect to the nature and extent of his limitations.

Plaintiff cannot rely only upon his statements to establish his disability. "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A). The ALJ determined that Plaintiff's testimony regarding his alleged symptoms was inconsistent with the medical record. For example, Plaintiff's allegations regarding

osteoarthritis in his hands was inconsistent with Dr. Rush's findings, and Plaintiff's assertion that he could only concentrate for 30 minutes at a time was unsupported by any evidence in the record. Although "a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain," *Light*, 119 F.3d at 792, it is one factor that may be considered. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."(citation omitted)); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("Citing the conflict between [the plaintiff's] testimony of subjective complaints and the objective medical evidence in the record, and noting the ALJ's personal observations, the ALJ provided specific and substantial reasons that undermined [the plaintiff's] credibility.")

The ALJ also determined that Plaintiff's medical care had been conservative in nature and that Plaintiff had "not received treatment consistent with a chronic pain syndrome such as biofeedback, acupuncture, use of a TENS unit, physical therapy, or attendance at a pain management clinic. Surgery has never been recommended." (AR 14.) Further, Plaintiff had been referred "to physical therapy, but there is no indication in the record that the claimant actually had physical therapy." (AR 14.) "The ALJ is permitted to consider lack of treatment in his credibility determination." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *see also Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (finding that the ALJ can consider whether "the claimant has not participated in any significant pain regimen or therapy program" in determining credibility). Further, the ALJ found that Plaintiff was "only 70 percent compliant with his diabetes mellitus diet and . . . weight loss diet, and is not fully compliant with his medications." (AR 14.) "[F]ailure to seek treatment or follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603.

The ALJ considered Plaintiff's daily activities when assessing the credibility of his statements. The ALJ found that Plaintiff's daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (AR 13.) The ALJ noted that:

> [C]laimant testified that he drives daily, takes care of and walks his dogs two to three times a week, does dishes twice a week, takes out the trash three times a week, waters

the yard three times a week, mows the lawn every two weeks, makes the bed twice a week, changes the sheets once a month with help from his wife, shops three times a month, goes to church twice a week, reads and listens to music daily for two hours each, goes to Bible study group once a week for an hour, and visits with friends and/or family twice a week.

(AR 13-14.)

An ALJ can appropriately consider Plaintiff's activities of daily living in determining that he was not entirely credible, but the mere fact of a claimant's carrying on certain daily activities does not necessarily detract from credibility as to overall disability. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). However, a negative inference is permissible where the activities contradict the other testimony of the claimant, or where the activities are of a nature and extent to reflect transferable work skills. *See Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002)*; Morgan*, 169 F.3d at 600. A claimant's performance of chores such as preparing meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others has been considered sufficient to support an adverse credibility finding when performed for a substantial portion of the day. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *Burch*, 400 F.3d at 680-81; *Thomas*, 278 F.3d at 959; *Morgan*, 169 F.3d at 600; *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990). Here, the extent of Plaintiff's daily activities were extensive enough to support such a negative inference, and are of a nature as to be transferable to a work setting.

"'Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation ... and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision.'" *Morgan*, 169 F. 3d at 600. As the ALJ's reasons were properly supported by the record and sufficiently specific, the Court must conclude that the ALJ rejected Plaintiff's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).

**C.      The ALJ Met His Burden at Step Five**

As noted above, the ALJ must conduct a five-step analysis in evaluating a claimant's disability. At Step Five, it is the Commissioner's burden to show that the claimant can perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). Plaintiff contends that the ALJ failed to meet that burden because the RFC finding and hypothetical

question posed to the VE did not accurately reflect Plaintiff's actual limitations. (Doc. 14, p. 11.) Plaintiff further contends that the jobs identified by the ALJ in his decision were invalid because they were all semi-skilled and the ALJ did not make a transferability finding; although there was one medium unskilled job identified by the VE, this job was not included in the ALJ's findings and the VE did not provide a code for the occupation from the Dictionary of Occupational Titles ("DOT"). (Doc. 14, p. 11-12.) Defendant contends that the ALJ properly relied upon the RFC determination that was based upon substantial evidence in the record, and thus properly disregarded the VE's responses to hypothetical questions that were inconsistent with the facts of this case. (Doc. 15, 11:12-25.) Further, the ALJ properly found that Plaintiff was capable of performing alternative jobs as indicated by the VE. (Doc. 15, 12:1-18.)

### 1.    Legal Standard

At the Fifth Step of the sequential analysis, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy. *Bray*, 554 F.3d at 1222. There are two ways for the Commissioner to satisfy this burden: "(1) by the testimony of a vocational expert, or (2) by reference to the Medical Vocational Guidelines [the "Grids"] at 20 C.F.R. p. 404, subpt. P, app. 2." *Tacket*, 180 F.3d 1094, 1099 (9th Cir. 1999). The Commissioner "must 'identify specific jobs existing in substantial numbers in the national economy that [the] claimant can perform despite [his] identified limitations.'" *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citation omitted).

### 2.    The ALJ Properly Rejected Restrictions Not Supported by the RFC

The ALJ determined that Plaintiff had the RFC to lift and carry up to 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk for six hours in an eight-hour day; could occasionally stoop and crouch and frequently climb, balance, kneel, and crawl; but should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (AR 12.) The ALJ based his findings on the substantial medical evidence in the record, which was, as discussed above, properly determined.

At the hearing held before the ALJ on May 27, 2009, the VE testified to a hypothetical question posed by the ALJ that contained all the limitations that the ALJ found credible and

supported by the record.  (AR 51-52.)  The VE testified that there were jobs that existed in significant numbers that Plaintiff could perform.  (AR 52-54.)  However, when the ALJ posed a second hypothetical based upon the restrictions testified to by Plaintiff, the VE indicated that no jobs existed in the national economy.  (AR 54-55.)

As noted above, the ALJ properly determined that the restrictions set forth by Plaintiff were not supported by substantial evidence in the record. As such, "the ALJ is free to accept or reject these restrictions. *See Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989); *see also Osenbrock*, 240 F 3d at 1164-65 ("An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence.").

Here, the first hypothetical posed to the VE included all of the limitations found by the ALJ to be supported by the substantial evidence in record.  When "[t]he hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record," then "[t]he ALJ's reliance on testimony the VE gave in response to the hypothetical therefore was proper."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (citation omitted).  As such, the ALJ could rely upon the VE's findings.

### 3.    The VE Provided Testimony That Identified Jobs Plaintiff Could Perform

Plaintiff contends that the specific occupations identified by the ALJ of construction laborer, equipment operator, and electrician were all invalid because the occupations are semi-skilled and the ALJ did not make a transferability finding of Plaintiff's skills.  (Doc. 14, p. 11.)  Plaintiff is incorrect.

The ALJ made a specific transferability finding and determined that the transferability of Plaintiff skills were "not material" to the disability determination.  Specifically, the ALJ's decision stated:

> Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(AR 15.)

1    The ALJ's determination is based upon the Grids, which establishes that a claimant of

2    Plaintiff's age and education, who had skilled or semi-skilled prior work experience that was not

3    transferrable, but who was able to perform unskilled medium work, would be found "not disabled."

4    20 C. F.R. pt. 404, subpt. P, app. 2, § 203.15.

5        The ALJ acknowledged that Plaintiff was unable to perform the entirety of all unskilled

6    medium jobs, finding that Plaintiff's "ability to perform all or substantially all of this level of work

7    has been impeded by additional limitations." (AR 16.)  Thus, to "determine the extent to which

8    these limitations erode[d] the unskilled medium occupational based," the ALJ solicited the testimony

9    of the VE to show that Plaintiff could perform unskilled medium jobs that exist in the national

10   economy. (AR 16.)

11       At the hearing, the VE testified that Plaintiff's prior work experience as a building

12   maintenance repairer was categorized as skilled and medium, although Plaintiff performed the job

13   at the heavy level. (AR 50.)  The VE stated that Plaintiff's skills were transferrable to medium level

14   work, but not to lighter level work, and then inexplicably identified three light, semi-skilled jobs that

15   Plaintiff could perform: construction laborer, equipment operator, and electrician. (AR 50, 53.)  It

16   was therefore unclear whether the VE was implying that Plaintiff's skills were transferable to light

17   level work, despite having indicated that his skills were only transferable to medium level work.

18   Plaintiff correctly points out that the light level jobs were discussed by the ALJ in his decision, and

19   argues that the ALJ cannot rely on these positions because Plaintiff's skills were not transferable to

20   any of them. (Doc. 14, pp. 11-12.)

21       Plaintiff is correct that the ALJ erred in citing light level jobs in his decision, since he was

22   seeking jobs from the VE that discussed the erosion of "the unskilled medium occupational base."

23   (AR 16.)  A citing of semi-skilled light jobs is incongruent with how Plaintiff could perform

24   unskilled medium work.

25       Plaintiff, however, fails to show how the ALJ's error was prejudicial, since the record shows

26   that the ALJ explicitly sought further testimony from the VE regarding Plaintiff's ability to do

27   unskilled medium work. (AR 54-55.)  Courts cannot use "mandatory presumptions and rigid rules"

28   when determining when error is harmless but must instead conduct a "case-specific application of

judgment, based upon examination of the record." *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009). "The federal 'harmless-error' statute, now codified at 28 U.S.C. § 2111, tells courts to review cases for errors of law 'without regard to errors' that do not affect the parties' 'substantial rights.' That language seeks to prevent appellate courts from becoming 'impregnable citadels of technicality.'" *Id*. at 407-08 (citation omitted).  The Ninth Circuit determined that the holding in *Sanders* applies to Social Security disability claims and further explained that "[w]here harmfulness of the error is not apparent from the circumstances, the party seeking reversal must explain how the error caused harm." *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011).

Here, the ALJ specifically questioned the VE regarding "the unskilled medium occupational base" and the extent Plaintiff's limitations "eroded" that base. (AR 16, *see also* AR 54-55.)  Further, the ALJ indicated in his decision that the jobs he referenced were "representative occupations." (AR 16.)  As noted, the ALJ also asked the VE about Plaintiff's ability to perform medium unskilled occupations. (AR 54.)  The VE testified that "[u]nder production works, medium, unskilled" there would be "roughly 7,000 jobs" in California after considering Plaintiff's limitations.  (AR 54.) Likewise, under "driving occupations," after considering erosion, there were 15,000 jobs in California, and there were 7,000 jobs as "hand packagers" in California after the numbers were reduced. (AR 54.)  The ALJ also indicated that if the numbers provided were multiplied by ten, that would give the approximate number of jobs available in the national economy.  (AR 52.)

As Plaintiff notes, the VE did not provide DOT codes for these occupations.  (Doc. 14, p. 12.)  However, as Plaintiff further points out, the DOT code for hand packager is DICOT 920.587-018.  (Doc. 14, p.12.)  Although Plaintiff asserts that this occupation "appears to be incompatible with Plaintiff's exertional and especially environmental limitations," Plaintiff fails to explain how the position is incompatible.  As noted above, the ALJ properly determined, and was entitled to rely upon, Plaintiff's RFC when inquiring as to jobs Plaintiff could perform. Additionally, the VE specifically reduced the number of available positions to 7,000 jobs to account for Plaintiff's limitations.  (Doc. 14, p. 12, *see also* AR 54.)  The Ninth Circuit has found that approximately 7,000 jobs (or less) is sufficient to show that a substantial number of jobs exist to meet the ALJ's burden at Step Five.  *See Thomas*, 278 F. 3d at 960 (finding 1,300 regional jobs

sufficient); *Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (finding 7,700 regional jobs sufficient); *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (finding 2,300 regional jobs sufficient).

While the Court notes that ALJ could have articulated his Step Five findings more clearly, any error he made is non-prejudicial because he sought and identified "'specific jobs existing in substantial numbers in the national economy that [the] claimant can perform despite [his] identified limitations.'" *Meanel*, 172 F.3d at 1114 (citation omitted).  Specifically, the record shows that the ALJ questioned the VE and determined that there was sufficient medium unskilled work that Plaintiff could perform.  (AR 54-55.)  "Further, the ALJ's reliance on the VE's testimony regarding the number of relevant jobs in the national economy was warranted.  An ALJ may take administrative notice of any reliable job information, including information provided by a VE."  *Bayliss*, 427 F.3d at 1218.

Plaintiff urges the Court to find that the ALJ's decision was "incorrect on its face and requires additional fact-finding on remand to remedy." (Doc. 16, p. 7.)  It is unclear what additional fact-finding Plaintiff is seeking.  Plaintiff's request implies that the Court should remand the case so that the ALJ can seek testimony from the VE to identify unskilled, medium level jobs that Plaintiff could perform.  However, the record shows that the ALJ requested such information and that the VE has already provided testimony as to these jobs.  As such, Plaintiff is requesting that we remand the case so that the ALJ can seek testimony that he has already sought and obtained. Further, that testimony in the record clearly establishes that there are unskilled medium jobs that Plaintiff can perform.  Accordingly, there is no need to remand a case to obtain testimony that is already contained in the record.

## CONCLUSION AND RECOMMENDATION

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court RECOMMENDS that the Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED.

These Findings and Recommendation are submitted to the district judge assigned to this action, pursuant to the 28 U.S.C. § 636(b)(l)(B) and this Court's Local Rule 304.  Within fifteen (15) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   February 14, 2012** _____/s/ Sheila K. Oberto_____
UNITED STATES MAGISTRATE JUDGE